UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Chafin and Malveaux
Argued at Norfolk, Virginia

MARTIN HOUSTON, SR.

MEMORANDUM OPINION* BY
v.      Record No. 1532-16-1                JUDGE TERESA M. CHAFIN
                                            JULY 11, 2017

CITY OF NEWPORT NEWS
  DEPARTMENT OF HUMAN SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Timothy S. Fisher, Judge

Udoka Obi Ndukwe for appellant.

Patrick C. Murphrey, Assistant City Attorney; Warren F. Keeling,
Guardian *ad litem* for the minor children, for appellee.

On September 6, 2016, the Circuit Court of the City of Newport News ("circuit court")

entered a series of orders pertaining to the four children of Martin Houston, Sr. The circuit court

approved permanency and foster care plans recommending adoption for each of the children, and

terminated Houston's residual parental rights. Houston appeals from these decisions.

Specifically, he contends that the circuit court erred by: 1) failing to dismiss the petitions filed

on behalf of the Newport News Department of Human Services ("DHS") that were signed by

non-attorney social workers, 2) denying his motion to quash a subpoena *duces tecum* regarding

his mental health records, and 3) terminating his parental rights in the absence of clear and

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

convincing evidence establishing that the criteria of Code § 16.1-283 had been satisfied.[1]  For the reasons that follow, we affirm the circuit court's decisions.

## I.  BACKGROUND

"When reviewing a [circuit] court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." Boatright v. Wise Cty. Dep't of Soc. Servs., 64 Va. App. 71, 76, 764 S.E.2d 724, 727 (2014) (quoting Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003)).  So viewed, the evidence is as follows.

Houston is the biological father of four children:  M.H.1 (born December 2, 2003), M.H.2 (born October 4, 2004), M.H.3 (born December 15, 2006), and M.H.4 (born July 7, 2009).  On October 24, 2013, DHS received a report alleging that Houston had injured M.H.3 by hitting him in the face.  DHS had previously received other reports alleging that Houston had physically abused his children.  When social workers from DHS went to Houston's residence to investigate the incident, they observed visible injuries on M.H.3's face.  The right side of his face, his right eye, and his forehead were red.  M.H.3 had also been bleeding.[2]  Eventually, M.H.1 and M.H.2 told the social workers that Houston caused the injuries by striking M.H.3 across the face.  All four children were placed in foster care following this incident.

---

[1] The circuit court also terminated the residual parental rights of the children's mother, Crystal Houston.  Crystal Houston appealed the circuit court's decision on the same grounds argued by the appellant in this case.  See Houston v. City of Newport News Dep't of Human Servs., No. 1456-16-1 (Va. Ct. App. July 11, 2017).

[2] The record of this case does not establish the extent of M.H.3's injuries.  It does, however, establish that the injuries caused M.H.3 to miss at least two days of school.  Comments made by Crystal Houston and the social workers suggest that M.H.3 may have sustained a concussion.

While the children were in foster care, they told social workers about other instances of physical abuse by Houston and their mother, Crystal Houston.[3] M.H.1 told social workers that "her parents would hit them, smack them in the face, kick them, throw things at them, put hot sauce and sap in their mouths, . . . grab them by the neck, . . . pull them by their ears and hit them with belts and shoes." She also said that her mother threw a glass bottle at M.H.3's head on one occasion. M.H.1 told social workers that "she was afraid that if she went back home to her parents, they would kill her and her siblings."

Despite the allegations of physical abuse from the children, Houston and his wife denied any form of wrongdoing. Houston denied that he ever hit or physically abused the children, and he explained that M.H.3 sustained the facial injuries observed by the DHS social workers when he fell on bleachers at a football game. Both parents, however, admitted that they used corporal punishment to discipline the children, and Crystal Houston admitted that she "popped" M.H.3 on the mouth on a daily basis.

After obtaining temporary custody of the children, DHS devised a plan to remedy the conditions that led to the placement of the children in foster care and return them to the custody of their parents. The initial foster care plans filed by DHS required Houston to meet several conditions in order to reach this goal.[4] Notably, the foster care plans required Houston to demonstrate that he could "provide an environment for [his] children that [was] safe and free from abuse [and] neglect," "reduce risk factors for abusing children," maintain a "lifestyle free of corporal punishment," and take parenting and anger management classes. The plans also

---

[3] Crystal Houston and Martin Houston, Sr., were married at all times relevant to this appeal.

[4] Although the foster care plans were modified during the proceedings to include the concurrent goal of relative placement, the requirements imposed by DHS generally remained the same until the goal of the foster care plans was changed to adoption.

required Houston to participate in individual and structural family therapy, and sign consent forms allowing DHS to receive information from his therapists to measure his progress. Additionally, Houston was required to maintain regular contact with his children and DHS.

The initial foster care plans also required Houston to participate in a parenting capacity evaluation and comply with its recommendations. Jennifer Gildea, a licensed clinical psychologist, conducted the parenting capacity evaluation on March 10, 2014. In the evaluation, Gildea noted that Houston "adamantly denied any wrongdoing." She also noted that Houston felt that he was being treated unfairly by DHS. While Houston admitted using corporal discipline with his children, he denied that any use of corporal discipline injured them.

Gildea explained that Houston's failure to accept responsibility for M.H.3's injuries increased his risk for "ongoing problematic parenting and interpersonal interactions at home." Gildea concluded that:

> Houston's risk for engaging in child physical abuse in the future is expected to remain in the moderate to high range without continued insight-building educational, supportive and therapeutic interventions, especially since he has not yet come to accept any level of accountability for events leading up to the children's removal from his care.

Accordingly, Gildea recommended ongoing individual and structural family therapy services to help Houston reduce the risks of future physical abuse of the children. Gildea also recommended marital therapy sessions, and encouraged Houston and his wife to "explore events leading up to the removal of the children from their care and the decisions, actions and responses they exhibited that may have contributed to this outcome." Additionally, Gildea recommended ongoing parenting classes and "one-on-one parenting coaching."

Initially, Houston actively addressed the requirements of the foster care plans and the parental capacity evaluation. He completed an anger management program and numerous parenting classes. He participated regularly in structural family therapy from March 2014 to

- 4 -

September 2014.  He also engaged in supervised visitation with his children during most of this time period.[5]

Houston attended individual therapy sessions with a therapist referred to him by DHS from November 2013 through May 2014.  Houston then stopped attending individual therapy for several months.  Although Houston resumed individual therapy and attended therapy sessions in November and December 2014, he eventually stopped attending individual therapy sessions with the therapist referred by DHS.  After December 2014, Houston sought individual therapy with other therapists and counseling from individuals at his church.  Houston, however, refused to sign a consent form allowing DHS to access his therapy records.  Therefore, DHS could not monitor Houston's therapeutic progress after December 2014.

From September 2014 to December 2014, Houston "took a break" from most of the services offered by DHS.  Houston stopped participating in structural family therapy sessions and communicating with his structural family therapist.  His supervised visitation with the children was also suspended due to a series of sexual abuse allegations involving them.[6]  During this time period, DHS employees attempted to contact Houston and his wife through telephone calls, letters, and unannounced visits to their home and church.[7]  Although DHS informed Houston through letters and voicemail messages that services were still available to him, he failed to respond to DHS or attend any meetings involving his children.

---

[5] DHS suspended Houston's visitation on May 23, 2014, due to an allegation of sexual abuse involving the children.  Supervised visitation was resumed in July 2014 after the allegation was determined to be unfounded.

[6] DHS suspended Houston's visitation on August 29, 2014, following additional allegations of sexual abuse.  Although these allegations were also determined to be unfounded, DHS did not resume visitation between Houston and the children following the additional complaints.

[7] A Court-Appointed Special Advocate ("CASA") involved in this case also unsuccessfully attempted to contact Houston and his wife through similar methods.

In the meantime, DHS located James and Melissa Lang, the maternal uncle and aunt of Houston's children. The Langs agreed to be relative placements for the children. On November 3, 2014, M.H.1 and M.H.4 were placed with the Langs. DHS planned to place M.H.2 and M.H.3 with the Langs as well after M.H.1 and M.H.4 and the Langs had time to adjust to their new living arrangements.

In December 2014, DHS held a team meeting regarding Houston's children. Neither Houston nor his wife attended this meeting. At the meeting, the team of individuals involved in this case determined that Houston and his wife had failed to remedy the conditions that led to the children's placement in foster care. Therefore, DHS recommended that the goal of the children's foster care plans should be changed to adoption. DHS also filed petitions to terminate Houston's residual parental rights regarding the children.

Houston and his wife resumed services with DHS shortly after this meeting. Houston resumed structural family therapy in February 2015, and participated until October 2015. He also participated in individual therapy until May 2016, but records suggested that this therapy primarily consisted of marriage counseling. Houston's contact with his children was limited during this time period due to the ongoing investigation of the sexual abuse allegations.

The Juvenile and Domestic Relations District Court of the City of Newport News ("JDR court") approved DHS's request to change the goal of the children's foster care plans to adoption on January 13, 2015. The JDR court, however, maintained the concurrent goal of relative placement in the children's foster care plans. At some point after January 13, 2015, the Langs expressed their desire to adopt all of Houston's children. DHS and the Langs both believed that adoption would provide a more stable environment for the children. The JDR court changed the goal of the children's foster care plans to adoption without relative placement on July 13, 2015.

On September 15, 2015, the JDR court terminated Houston's residual parental rights regarding his four children pursuant to Code § 16.1-283(C). The JDR court determined that clear and convincing evidence established that Houston had failed to substantially remedy the conditions that led to his children's placement in foster care. The JDR court terminated Crystal Houston's residual parental rights for the same reason. Houston and his wife appealed the JDR court's termination decision, as well as the JDR court's decisions pertaining to his children's permanency and foster care plans, to the circuit court.

Before the appeal was heard in circuit court, Crystal Houston filed a motion to dismiss the petitions previously filed by DHS regarding her children. She contended that the petitions were invalid because they were signed and filed by non-attorney employees of DHS rather than attorneys licensed to practice law in the Commonwealth. Therefore, Crystal Houston argued that the circuit court lacked jurisdiction to consider the cases at issue. Houston adopted his wife's motion.[8] After hearing argument on the issue, the circuit court denied the motion to dismiss.

Both Houston and his wife filed motions to quash a subpoena *duces tecum* issued to obtain mental health records from a psychologist and psychiatrist employed at Therapy Associates of Denbigh, Inc. Houston and his wife participated in individual therapy and marriage counseling with these mental health care providers after they stopped attending individual therapy with the therapist referred to them by DHS. Citing Code § 32.1-127.1:03(H), Houston argued that the subpoena *duces tecum* should be quashed to protect the confidentiality of his mental health records. He also contended that the records at issue were irrelevant.

The circuit court denied the motions to quash filed by both Houston and his wife. The circuit court, however, ordered that the mental health records at issue could only be used for the

---

[8] It is unclear from the record when Houston joined his wife's motion to dismiss on these grounds. The circuit court's order concerning the motion, however, expressly indicated that Houston adopted the motion.

purposes of this case. The circuit court also prohibited the dissemination of the records to third parties.

At the termination hearing before the circuit court, DHS presented testimony from social workers and therapists involved with Houston's case. Among other things, these individuals testified about the requirements imposed on Houston by his children's foster care plans. They then testified about Houston's compliance with these requirements. While DHS's witnesses admitted that Houston had satisfied many requirements of the foster care plans, they consistently testified that Houston had failed to make substantial progress in eliminating the risks he posed to his children.

Marcella Hollingsworth, a family engagement specialist who worked with the Houstons, testified that Houston had "little insight" regarding the nature of M.H.3's injuries and that he consistently denied committing any physical abuse of the children. She explained that Houston needed to be able to identify the risks in his family in order to be capable of alleviating those risks, and opined that he had to commit to therapy to achieve this goal.

Christina Riley, the Houston's structural family counselor, testified that Houston did not show proper insight regarding the physical abuse of his children. She also opined that Houston did not "fully commit" to therapy. Riley testified that Houston had not made "any progress in regards to [his] insight and to what brought the children into care." She then expressly testified, without objection, that, in her opinion, the conditions that led to the children's placement in foster care had not been remedied.

At the conclusion of DHS's evidence, Houston moved to strike the evidence that had been presented. The circuit court denied the motion. Houston then testified on his own behalf. He briefly described the steps that he had taken to comply with the requirements of his children's

foster care plans. He then testified about the injuries to M.H.3 that led to the children being placed in foster care. Specifically, Houston stated:

> As far as the abuse allegation with [M.H.3], yes, he was spanked on the day in question, and yes, I did strike him across the face. My primary strike was to his mouth. I did not think I left any kind of bruising other than what was already there from his injury that occurred from his fall.

He later clarified that his disciplinary actions regarding M.H.3 were "inappropriate" and that it would not be appropriate to strike a child in the future.

At the conclusion of evidence, DHS urged the circuit court to terminate Houston's residual parental rights due to his failure to remedy the conditions that led to his children's placement in foster care. The guardian *ad litem* for the children joined DHS's position. The circuit court agreed with DHS and the guardian *ad litem* and terminated Houston's residual parental rights pertaining to all of his children. The circuit court also approved the permanency and foster care plans recommending adoption for each of the children. This appeal followed.

## II. ANALYSIS

This case presents multiple issues for appellate review. First, Houston contends that the circuit court erred by failing to dismiss the petitions filed by DHS because they were signed by non-attorney social workers rather than licensed attorneys. Second, Houston argues that the circuit court erred by denying his motion to quash the subpoena *duces tecum* regarding his mental health records. Third, Houston challenges the circuit court's decision to terminate his residual parental rights. Houston contends that the evidence presented in this case did not establish that he willfully failed to remedy the conditions that led to his children's placement in foster care and that the termination of his parental rights was in the best interests of the children. He also argues that the circuit court erred by failing to determine that the two oldest children were of the age of discretion to object to the termination of his parental rights. As a preliminary

matter, DHS contends that Houston's appeal should be dismissed due to his failure to list the case numbers of the termination cases in his notice of appeal.

Upon review, we conclude that Houston's notice of appeal adequately identified the cases that he intended to appeal. Therefore, we deny DHS's motion to dismiss. For the reasons that follow, however, we affirm the circuit court's decisions.

### A. DHS'S MOTION TO DISMISS

On February 6, 2017, DHS filed a motion to dismiss Houston's appeal. As previously stated, this motion was based on alleged defects in Houston's notice of appeal. Although Houston's notice of appeal listed the case numbers for the cases pertaining to his children's permanency planning and foster care review cases, the notice of appeal failed to list the case numbers corresponding to the termination of parental rights cases. DHS contends that Houston's failure to list the case numbers of the termination cases is fatal to his appeal. We disagree.

Rule 5A:6 addresses the procedural requirements pertaining to notices of appeal filed in this Court. In pertinent part, Rule 5A:6(a) states:

> No appeal shall be allowed unless, within 30 days after entry of final judgment or other appealable order or decree, or within any specified extension thereof granted by this Court under Rule 5A:3(a), counsel files with the clerk of the trial court a notice of appeal, and at the same time mails or delivers a copy of such notice to all opposing counsel.

See also Code § 8.01-675.3 (imposing an identical time requirement). Rule 5A:6(b) addresses the content of a notice of appeal. That subsection states, in its entirety, "The notice of appeal shall contain a statement whether any transcript or statement of facts, testimony, and other incidents of the case will be filed." Rule 5A:6(b). Notably, Rule 5A:6(b) does not expressly require a notice of appeal to list the case number of the case intended to be appealed.

"Succinctly stated, . . . two aspects of a notice of appeal are mandatory substantive requirements: a notice of appeal must be timely filed, and *it must 'adequately identif[y] the case*

*to be appealed.*'"[9] Evans v. Commonwealth, 61 Va. App. 339, 345, 735 S.E.2d 252, 254-55

(2012) (emphasis added) (quoting Roberson v. Commonwealth, 279 Va. 396, 407, 689 S.E.2d

706, 712-13 (2010)).

> While the filing of a timely notice of appeal is a
> prerequisite to an appellate court's obtaining and exercising
> jurisdiction over a case, not every requirement of the rule
> prescribing when and how a notice of appeal is to be prepared and
> filed implicates the court's initial acquisition of jurisdiction.  Thus,
> we have never required that the notice of appeal be precise,
> accurate, and correct in every detail before the appellate court can
> acquire jurisdiction over the case in which the notice is filed.

Ghameshlouy v. Commonwealth, 279 Va. 379, 391, 689 S.E.2d 698, 704 (2010).  "As a general

rule, insubstantial defects in a timely filed appeal 'should not be fatal where no genuine doubt

exists about who is appealing, from what judgment, to which appellate court.'"  Christian v. Va.

Dep't of Soc. Servs., 45 Va. App. 310, 315, 610 S.E.2d 870, 872 (2005) (quoting Becker v.

Montgomery, 532 U.S. 757, 767-68 (2001)).  "Neither the Rules nor prior case decisions

mandate dismissal of an appeal when an error of reference and not timely filing is at issue."

Carlton v. Paxton, 14 Va. App. 105, 109-10, 415 S.E.2d 600, 602 (1992).

While it may have been a better practice to list the case numbers corresponding to the

termination cases in Houston's notice of appeal, we conclude that Houston's failure to do so did

not deprive this Court of appellate jurisdiction regarding the cases at issue.  Although Houston

failed to list the case numbers corresponding to the termination cases in his notice of appeal, the

notice of appeal stated that Houston intended to appeal the termination decisions.  Specifically,

the body of Houston's notice of appeal stated:

> MARTIN HOUSTON, SR. hereby appeals to the Court of Appeals
> of Virginia from the final judgment of the Newport News Circuit
> Court entered on or about September 6, 2016, which approved a
> foster care plan goal of adoption and terminated Houston's

---

[9] Houston's notice of appeal was timely filed in this case, and DHS does not contest this issue.

- 11 -

> parental rights with respect to his biological children, [M.H.1, M.H.2, M.H.3, and M.H.4].

We conclude that this express reference to the termination decisions sufficiently indicated that Houston intended to appeal those decisions. Thus, Houston's notice of appeal "adequately identif[ied]" the termination cases as cases to be appealed to this Court. See Evans, 61 Va. App. at 345, 735 S.E.2d at 255.

As Houston's notice of appeal adequately established that he intended to appeal the circuit court's decision to terminate his residual parental rights, we deny DHS's motion to dismiss this case.

### B. THE PETITIONS SIGNED BY NON-ATTORNEY DHS EMPLOYEES

In his first assignment of error, Houston contends that the circuit court erred by denying his motion to dismiss the petitions filed by DHS. Houston argues that the petitions at issue were void because they were signed and filed by social workers employed by DHS rather than licensed attorneys. While we agree that the relevant petitions were signed by non-attorney DHS employees rather than attorneys, we disagree with Houston's position.

A recent case decided by this Court controls this issue. This Court addressed an identical argument based on similar facts in Rudolph v. City of Newport News Dep't of Human Servs., 67 Va. App. 140, 793 S.E.2d 831 (2016).[10] In Rudolph, the appellants attacked the validity of pleadings signed by non-attorney social workers employed by DHS. See id. at 143-44, 793 S.E.2d at 833. As these pleadings were not signed by licensed attorneys, the appellants argued that they "constituted the unauthorized practice of law and deprived the courts below of active jurisdiction." Id. at 144, 793 S.E.2d at 833. The pleadings challenged by the appellants included

---

[10] We acknowledge that this opinion was published on December 20, 2016, over three months after the circuit court's decisions were made in this case.

- 12 -

petitions signed by social workers on behalf of DHS that requested the termination of the appellants' parental rights. Id.

This Court determined that the pleadings at issue were valid and did not constitute the unauthorized practice of law. Id. at 150, 793 S.E.2d at 836. Citing legislative history and a prior opinion of the Attorney General, this Court concluded that "the intent of the General Assembly has been to allow employees of local departments of social services to sign form petitions on behalf of their employer department of social services, provided that those petitions are form petitions approved for use by the Supreme Court." Id. at 149, 793 S.E.2d 836. As the petitions at issue in Rudolph were approved form petitions, this Court held that the lower courts had active jurisdiction to adjudicate the contested matters, and subsequently, affirmed the lower courts' decisions. Id. at 150, 793 S.E.2d at 836.

The present case is indistinguishable from Rudolph. Like in Rudolph, social workers employed by DHS signed petitions regarding the welfare of children and filed them on behalf of their employer. These petitions were form petitions approved for use by the Supreme Court of Virginia. Accordingly, we reject Houston's argument concerning this issue. Pursuant to Rudolph, we conclude that the pleadings at issue were valid pleadings that gave the circuit court active jurisdiction to consider the cases before it.

## C.  HOUSTON'S MOTION TO QUASH

In his second assignment of error, Houston argues that the circuit court erred by denying his motion to quash the subpoena *duces tecum* pertaining to his mental health records. Houston contends that these records contained privileged confidential information that should not have been disclosed to DHS or other third parties. He also argues that the mental health records at issue were irrelevant to the proceedings.

- 13 -

"[W]e review a trial court's decision regarding a motion to quash the issuance of a subpoena *duces tecum* under an abuse of discretion standard." Ramsey v. Commonwealth, 63 Va. App. 341, 358, 757 S.E.2d 576, 584 (2014) (quoting Schwartz v. Commonwealth, 45 Va. App. 407, 450, 611 S.E.2d 631, 652 (2005)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." Tynes v. Commonwealth, 49 Va. App. 17, 21, 635 S.E.2d 688, 689 (2006) (quoting Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743, adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005)).

Code § 32.1-127.1:03 addresses health record privacy. Code § 32.1-127.1:03(H) specifically addresses the requirements for a subpoena *duces tecum* requesting health records. In turn, Code § 32.1-127.1:03(H)(6) addresses a motion to quash such a subpoena. That subsection states:

> In the event that the individual whose health records are being sought files a motion to quash the subpoena, the court . . . shall decide whether good cause has been shown by the discovering party to compel disclosure of the individual's health records over the individual's objections. In determining whether good cause has been shown, the court . . . shall consider
>
> (i) the particular purpose for which the information was collected;
>
> (ii) the degree to which the disclosure of the records would embarrass, injure, or invade the privacy of the individual;
>
> (iii) the effect of the disclosure on the individual's future health care;
>
> (iv) the importance of the information to the lawsuit or proceeding; and
>
> (v) any other relevant factor.

Code § 32.1-127.1:03(H)(6).

Upon review, we conclude that the circuit court did not abuse its discretion by denying Houston's motion to quash the subpoena *duces tecum* pertaining to the mental health records at

- 14 -

issue. When the factors listed in Code § 32.1-127.1:03(H)(6) are considered in the context of the present case, we find that the circuit court appropriately determined that good cause existed to compel the disclosure of Houston's mental health records.

In order to remedy the conditions that led to his children's placement in foster care, Houston was required to participate in different types of therapy to reduce the risk of physical abuse that he posed to his children. As a condition of his children's foster care plans, Houston was required to participate in individual therapy and structural family therapy. Furthermore, Houston's parenting capacity assessment recommended that he participate in individual therapy, structural family therapy, and marital therapy.

Despite these requirements, Houston stopped participating in individual therapy with the therapist referred to him by DHS. Although he claimed that he attended individual therapy with different mental healthcare providers, Houston refused to sign a consent form allowing DHS to access his therapy records. Therefore, DHS had to file the subpoena *duces tecum* at issue to gain access to Houston's mental health records.

Houston's participation in therapy was central to this case, and the mental health records requested by the subpoena *duces tecum* were of great importance to these proceedings. See Code § 32.1-127.1:03(H)(6)(iv). The records at issue were required to assess whether Houston was: 1) actually participating in therapy, 2) participating in relevant therapy designed to address the risks he posed to his children, and 3) making progress in therapy to eliminate the conditions that led to his children's placement in foster care. Accordingly, Houston's contention that the records were irrelevant is without merit.[11]

---

[11] Houston also argues that the mental health records at issue were irrelevant because they only contained information regarding marriage counseling. As Houston's parenting capacity assessment recommended that Houston participate in marital therapy, these records would have been relevant even if they only contained information solely pertaining to marriage counseling. Thus, this argument is also without merit.

Furthermore, it should be noted that the circuit court took steps to protect the privacy of the confidential information contained in Houston's mental health records. While the circuit court denied Houston's motion to quash the subpoena *duces tecum*, it imposed conditions designed to protect the information contained in the records. The circuit court prohibited any use of the information contained in the mental health records outside of the current proceedings, and prohibited the dissemination of the records to third parties. Thus, the circuit court took steps to lessen "the degree to which the disclosure of the records would embarrass, injure, or invade the privacy of [Houston]." See Code § 32.1-127.1:03(H)(6)(ii).

For these reasons, the circuit court did not err in denying the motion to quash the subpoena *duces tecum*.

## D. THE CIRCUIT COURT'S DECISION TO TERMINATE HOUSTON'S RESIDUAL PARENTAL RIGHTS

In his third assignment of error, Houston challenges the circuit court's termination decision. Houston contends that the evidence presented by DHS failed to establish that the criteria of Code § 16.1-283 had been satisfied. Specifically, he argues that the evidence did not establish that he had failed to remedy the conditions that led to his children's placement in foster care. He also argues that the evidence failed to establish that the termination of his residual parental rights was in the best interests of his children.[12] We disagree with both of these arguments.

---

[12] In Houston's assignment of error, he also contends that the evidence failed to prove that "there was no less drastic alternative than termination." However, he advances no argument to support this contention. Rule 5A:20(e) requires an appellant's opening brief to contain "the argument (including principles of law and authorities) relating to each assignment of error." "[W]hen a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a question presented as waived.'" Parks v. Parks, 52 Va. App. 663, 664, 666 S.E.2d 547, 548 (2008) (quoting Jay v. Commonwealth, 275 Va. 510, 520, 659 S.E.2d 311, 317 (2008)). "Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration." Atkins v. Commonwealth, 57 Va. App. 2, 20, 698 S.E.2d 249, 258 (2010) (quoting Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d

"In matters of a child's welfare, [circuit] courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168, 754 S.E.2d 922, 927 (2014) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). "When reviewing a decision to terminate parental rights, we presume the circuit court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "Where the circuit court's judgment is based on evidence heard *ore tenus*, its decision to terminate a parent's rights is entitled to great weight and [the decision] 'will not be disturbed on appeal unless [it is] plainly wrong or without evidence to support it.'" Thach, 63 Va. App. at 168-69, 754 S.E.2d at 927-28 (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463).

In the present case, the circuit court terminated Houston's parental rights based on Code § 16.1-283(C)(2). The termination of residual parental rights pursuant to this subsection requires two separate inquires. Id. at 169, 754 S.E.2d at 928. First, the circuit court must determine whether the termination is in the best interests of the child. Id. Second, the circuit court must determine whether DHS has met its burden of proving the specific requirements of subsection (C)(2) of Code § 16.1-283. Id. The circuit court's determination of both inquiries must be based on clear and convincing evidence, and the circuit court may only terminate an individual's parental rights if it determines that the termination is in the best interests of the child *and* the requirements of Code § 16.1-283(C)(2) have been met. Id. at 170, 754 S.E.2d at 928.

237, 239 (1992)). As Houston provided no legal argument to support this particular contention, and we find this omission significant, we conclude that Houston has waived this issue.

- 17 -

Code § 16.1-283(C)(2) permits a circuit court to terminate residual parental rights when:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2) then states:

> Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute *prima facie* evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

Accordingly, Code § 16.1-283(C)(2) is primarily concerned with a parent's efforts to remedy the situation that led to the placement of his or her children in foster care. See Code § 16.1-283(C)(2); Thach, 63 Va. App. at 170, 754 S.E.2d at 928. This statute requires a court "to determine whether the parent has been unwilling or unable to remedy the problems [at issue] during the period in which he has been offered rehabilitation services." Toms, 46 Va. App. at 271, 616 S.E.2d at 772. Termination decisions based on Code § 16.1-283(C)(2) "hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Id.

In the present case, the circuit court determined that Houston had failed to remedy the conditions that led to his children's placement in foster care and that the termination of his parental rights was in the best interests of the children. These conclusions were not plainly wrong or unsupported by the evidence.

- 18 -

Houston's children were placed in foster care due to the risk of physical abuse that he posed to them. The children were taken into custody after Houston struck M.H.3 across the face and injured him significantly – badly enough that he had to miss two days of school. Furthermore, numerous allegations of additional abuse were voiced by his children while they were in foster care. Houston's parenting capacity assessment concluded that he posed a "moderate to high" risk for engaging in the physical abuse of his children in the future.

In order to reduce the risk that Houston would continue to physically abuse his children, DHS recommended that he take parenting and anger management classes and participate in several types of therapy. Similarly, Gildea, the clinical psychologist who conducted Houston's parenting capacity assessment, recommended that he participate in multiple types of classes and therapy. Notably, Gildea concluded that "Houston's risk for engaging in child physical abuse in the future is expected to remain in the moderate to high range without . . . therapeutic interventions."

Despite the recommendations of his parenting capacity assessment and the requirements of his children's foster care plans, Houston eventually stopped participating in therapy. He did not attend structural family therapy from September 2014 through February 2015.[13] Although he sporadically participated in individual therapy after his children were placed in foster care, Houston stopped attending individual therapy with the therapist referred to him by DHS in December 2014.

While Houston claimed that he participated in individual therapy with other therapists and individuals at his church after December 2014, he refused to sign a consent form allowing DHS to access his therapy records. Accordingly, DHS could not monitor Houston's

---

[13] Although Houston resumed structural family therapy in February 2015, he eventually quit participating in October 2015 after the JDR court terminated his parental rights.

participation in individual therapy or measure his therapeutic progress after December 2014. Although the records obtained through the subpoena *duces tecum* at issue in this case suggested that Houston participated in individual therapy until May 2016, the records also suggested that this therapy primarily consisted of marriage counseling rather than therapy specifically structured to reduce his risk factors for physical abuse.

Based on Houston's failure to continually participate in therapy and make measurable therapeutic progress, DHS concluded that Houston had failed to remedy the condition that led to his children's placement in foster care. The DHS employees involved in Houston's case consistently testified that he continued to pose a risk of physical abuse. The DHS employees were particularly concerned by Houston's failure to admit that he ever physically abused his children.

While the employees acknowledged that Houston had satisfied some of the requirements imposed by his children's foster care plans, they believed that Houston had failed to "fully commit" to the plans or his therapy sessions. Hollingsworth, the Houstons' family engagement specialist, testified that Houston needed to commit to therapy in order to be able to identify the risks he posed to his family. Riley, the Houstons' structural family counselor, testified that Houston had not made any progress in eliminating the conditions that led to his children's placement in foster care.

Houston's testimony at the termination hearing supported the concerns of the DHS employees. While Houston testified about the steps he had taken to comply with the requirements of his children's foster care plans, he refused to admit that he ever harmed M.H.3. Instead, Houston admitted that he "spanked" M.H.3 "across the face" on the day in question, and attributed M.H.3.'s injuries to an earlier fall. Although Houston admitted that these disciplinary actions were inappropriate and claimed that he would not physically strike any of the children in

the future, he never fully acknowledged his responsibility for the event that led to his children's placement in foster care.

Based on the evidence presented at the termination hearing, the circuit court reasonably concluded that Houston had failed to remedy the conditions that led to his children's placement in foster care. Despite the numerous services offered to Houston throughout the three-year period that his children had been in foster care,[14] he still refused to acknowledge the problem that created the original danger to the children. Houston's sporadic therapy participation and his refusal to accept responsibility for the injuries incurred by M.H.3 and the physical abuse of the other children implied that he had failed to make substantial therapeutic progress.[15] Thus, the circuit court could have inferred that Houston continued to pose a risk of physical harm to his children. For these reasons, the circuit court did not err by determining that the requirements of Code § 16.1-283(C)(2) had been satisfied.

Furthermore, the circuit court reasonably determined that the termination of Houston's residual parental rights was in the best interests of the children.

> In determining what is in the best interests of the child, the circuit court must evaluate and consider many factors: the age and physical and mental condition of the child; the age and physical and mental condition of the parent; *the relationship existing between the parent and the child; the needs of the child; the role the parent has played, and will play in the future, in the upbringing and care of the child; and any other such factors that are necessary.*

---

[14] "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

[15] We note that Houston's failure to make substantial therapeutic progress in accordance with the goals of his children's foster care plans constituted *prima facie* evidence that he had failed to remedy the conditions that led to his children's placement in foster care. See Code § 16.1-283(C)(2).

Thach, 63 Va. App. at 169, 754 S.E.2d at 928 (emphasis added).  As previously stated, circuit courts are vested with broad discretion in determining what is in a child's best interests.  Id. at 168, 754 S.E.2d at 927.

In the present case, the circuit court believed that Houston had failed to remedy the conditions that led to his children's placement in foster care and that he continued to pose a risk to the children.  Based on the evidence presented by DHS, there was a "moderate to high" risk that Houston would continue to physically abuse his children in the future.

Moreover, Houston's children were living in stable foster care placements with relatives who wanted to adopt them.  The children had adjusted well to living with the Langs, and the Langs met their physical, social, emotional, and therapeutic needs.  While each of the children had behavioral and psychological issues requiring therapeutic intervention, they had made "progress" while living with the Langs.  The adoption of the children by the Langs would provide them with a caring, stable, and permanent home.

Under the circumstances presented in this case, the circuit court did not err by terminating Houston's residual parental rights.[16]  The evidence established that Houston had failed to remedy the conditions that led to his children's placement in foster care and that the termination of his residual parental rights was in the children's best interests.

---

[16] As the evidence was sufficient to support the circuit court's decision to terminate Houston's residual parental rights pursuant to Code § 16.1-283(C)(2), it was also sufficient to support the circuit court's decisions to enter permanency planning orders with the goal of adoption and to approve the foster care plans with the goal of adoption.  See Najera v. Chesapeake Div. of Soc. Servs., 48 Va. App. 237, 241, 629 S.E.2d 721, 722 (2006) ("A preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations, while the more stringent clear-and-convincing-evidence standard applies to the ultimate termination decision.").  We also note that the evidence supported the denial of Houston's motion to strike.

## E. THE AGE OF DISCRETION ISSUE

On appeal, Houston also contends that the circuit court erred by determining that M.H.1 and M.H.2, his two oldest children, were not of the age of discretion to object to the termination of his parental rights pursuant to Code § 16.1-283(G).[17] We conclude that Houston waived this appellate argument by failing to present it to the circuit court.

Rule 5A:18 states, in pertinent part, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Pursuant to Rule 5A:18, we "will not consider an argument on appeal which was not presented to the trial court." Tackett v. Arlington Cty. Dep't of Hum. Servs., 62 Va. App. 296, 315, 746 S.E.2d 509, 519 (2013) (quoting Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998)).

In the present case, Houston failed to argue that M.H.1 and M.H.2 were of the age of discretion to object to the termination of his parental rights. In fact, he never referenced Code § 16.1-283(G) at any point during the proceedings in the circuit court. While counsel for Crystal

---

[17] Code § 16.1-283(G) states:

> Notwithstanding any other provisions of this section, residual parental rights shall not be terminated if it is established that the child, if he is 14 years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination. However, residual parental rights of a child 14 years of age or older may be terminated over the objection of the child, if the court finds that any disability of the child reduces the child's developmental age and that the child is not otherwise of an age of discretion.

While we do not reach the merits of this argument, we note that M.H.1 was thirteen years old at the time of the termination hearing and M.H.2 was twelve years old at the time of the termination hearing. We also note that M.H.1 had repeatedly expressed that she did not wish to return to the care of her parents and that M.H.2 was autistic. Additionally, we acknowledge that the children did not testify in this case.

Houston presented this argument to the circuit court, Houston did not join this argument. "[O]ne party may not rely on the objection of another party to preserve an argument for appeal without expressly joining in the objection." Linnon v. Commonwealth, 287 Va. 92, 102, 752 S.E.2d 822, 828 (2014).

As Houston never argued that his children were of the age of discretion to object to the termination of his parental rights, we conclude that appellate review of this issue is barred by Rule 5A:18. Accordingly, we do not consider the merits of this argument.

III.  CONCLUSION

In summary, we deny DHS's motion to dismiss this case because Houston's notice of appeal adequately identified the cases that he intended to appeal. We affirm the circuit court's decisions, however, because:  1) the signatures of the non-attorney DHS employees did not invalidate DHS's termination petitions, 2) the circuit court did not err in denying Houston's motion to quash the subpoena *duces tecum* regarding his mental health records, and 3) the evidence presented in this case established the criteria set forth in Code § 16.1-283(C)(2), and therefore, supported the circuit court's decision to terminate Houston's residual parental rights regarding each of his four children. For these reasons, the circuit court's decisions are affirmed.

Affirmed.